UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

FRANCES SEKULA o/b/o          :
THOMAS SEKULA-MORALES,        :
          Plaintiff,          :
                              :
     v.                       :     CA 03-431M
                              :
JO ANNE B. BARNHART,          :
Commissioner,                 :
Social Security Administration, :
          Defendant.          :

## MEMORANDUM AND ORDER

This matter is before the court on a request for judicial
review of a final decision of the Commissioner of Social Security
("the Commissioner"), denying supplemental security income
("SSI"), brought pursuant to §§ 205(g) and 1631(c)(3) of the
Social Security Act ("the Act"), as amended, 42 U.S.C. §§ 405(g)
and 1383(c)(3).  Plaintiff Frances Sekula ("Plaintiff"), on
behalf of her son, claimant Thomas Sekula-Morales ("Thomas" or
"the claimant"), has filed a motion for an order reversing the
decision of the Commissioner or, alternatively, remanding the
matter to the Commissioner.  Defendant Jo Anne B. Barnhart
("Defendant") has filed a motion for an order affirming the
decision of the commissioner.

With the consent of the parties, this case has been referred
to a magistrate judge for all further proceedings and the entry
of judgment in accordance with 28 U.S.C. § 636(c) and Fed. R.
Civ. P. 73.  For the reasons set forth herein, I find that the
Commissioner's decision is supported by substantial evidence and
is legally correct.  Accordingly, I order, based on the following
analysis, that Defendant's Motion for an Order Affirming the
Decision of the Commissioner (Document #12) ("Motion to Affirm")

be granted and that Plaintiff's Motion for Order Reversing or
Alternatively Remanding the Decision to the Secretary (Document
#11) ("Motion to Reverse or Remand") be denied.

### Procedural History

Plaintiff applied for SSI on behalf of her son, Thomas, on
May 15, 2000, alleging that he was disabled as of September 1,
1996, due to a learning disorder.  (Record ("R.") at 14-15, 65,
67-70, 71-95)  The claim was denied initially and on
reconsideration (R. at 14, 46, 48, 50-53, 54, 56-59), and a
request for a hearing before an Administrative Law Judge ("ALJ")
was timely filed (R. at 14, 60-61).  The hearing was held on
February 5, 2003.  (R. at 14, 27)  Plaintiff and Thomas,
represented by counsel, appeared and testified.  (Id.)

On February 25, 2003, the ALJ issued a decision in which he
concluded that Thomas was not disabled within the meaning of the
Act and, therefore, not eligible for SSI payments.  (R. at 14-20)
Plaintiff appealed the decision to the Appeals Council (R. at 9,
218-19), which on July 23, 2003, declined review (R. at i, 5-7),
thereby rendering the ALJ's decision the final decision of the
Commissioner.

On September 24, 2003, Plaintiff filed a Complaint (Document
#1) in this court, challenging the denial of benefits and
requesting that the court reverse the decision of the
Commissioner and order that Plaintiff be awarded SSI or, in the
alternative, remand the matter for the application of the correct
legal standard or for the taking of additional evidence.  See
Complaint at 3.  Defendant filed her Answer (Document #2) on
December 1, 2003.  Pursuant to both parties' consent, the case
was referred on January 26, 2004, to this Magistrate Judge for
disposition.  See Order of Reference (Document #3).  Plaintiff's
Motion to Reverse or Remand was filed on June 1, 2004.  On June
24, 2004, Defendant filed the Motion to Affirm.

## Issue

The issue for determination is whether there is substantial evidence in the record to support the decision of the Commissioner that Thomas did not have an impairment or combination of impairments resulting in marked and severe functional limitations and, therefore, was not disabled within the meaning of the Act.

## Background

Thomas, born on March 19, 1991, was nine years old when the application for benefits was filed and eleven years old at the time of the hearing.  (R. at 15, 30)  At that point, he was in the sixth grade in a special education setting.  (R. at 15, 30, 33, 35)  He had repeated the first grade (R. at 30, 37) and had been in special education since 2000 (R. at 18, 189).

## Evidence

### I.  Medical

The record contains a report of a psychological evaluation done by Elaine Gelineau, Ph.D., on October 8, 1998, for the Providence School Department ("PSD").  (R. at 156-58)  Dr. Gelineau first noted that Thomas, who was repeating the first grade at that time, was "functioning somewhat below grade level in all academic subjects."  (R. at 156)  On the Weschler Intelligence Scale for Children – 3rd Edition ("WISC-III"), Thomas obtained a Verbal Scale IQ score of 91, a Performance Scale IQ score of 80, and a Full Scale IQ score of 84.  (R. at 156, 158)  The latter score "suggest[ed] low average abilities." (R. at 156)  However, Dr. Gelineau observed that because Thomas was "visually distractable" (id.), the "findings may under-estimate [his] true potential" (id.).

Dr. Gelineau also reported that the claimant's "lack of concentration and inability to focus on his work concerns his teacher the most."  (Id.)  The Child Behavior Checklist was

3

"borderline significant for attention problems and social skill delay." (R. at 157)

Alan Rooney, Psy.D., conducted another psychological evaluation of Thomas on April 30, 2001, at the request of Disability Determination Services ("DDS"). (R. at 168-71)  He, too, administered the WISC-III, and Thomas obtained a Verbal Scale IQ of 81, within the low average range. (R. at 169) Thomas' Performance Scale IQ and Full Scale IQ scores of 77 fell within the borderline range. (Id.)  According to Dr. Rooney, "[a] four point difference between Verbal and Performance Scale Scores is not significant and indicates comparably developed verbal and performance or nonverbal abilities." (Id.)  Dr. Rooney observed that Thomas followed instructions, had no difficulty in understanding, adapted easily to new tasks, responded well to challenges, and maintained consistent effort. (R. at 168)  He diagnosed Thomas with borderline intellectual functioning. (R. at 170)

Dr. Rooney also assessed the claimant's ability to function in the various domains. (R. at 170-71)  In the area of acquiring and using information, Dr. Rooney stated that:

> Thomas' overall level of intellectual ability was found
> to lie within the borderline range with slightly better
> verbal ability in contrast to his performance or
> nonverbal ability. This disparity however is not
> significant. In general, Thomas' ability to acquire and
> utilize information is well below average. Extra effort
> will be required on his part in acquiring and using
> information and he will certainly benefit from
> educational interventions aimed at meeting him at his
> level of ability.

(R. at 170)

As for attending and completing tasks, Dr. Rooney stated that "Thomas did not appear to have any difficulty remaining on task within this evaluation.  He did not show signs

4

of fidgetiness." (Id.)  Dr. Rooney opined that "[i]t is expected that he should be able to remain on task in activities of which he is cognitively capable.  Should Thomas be engaged in tasks that are beyond his level of ability, it is certainly likely that his attention would wane." (Id.)

Ann M. Frank, Psy.D., who reviewed the record for DDS pursuant to Plaintiff's initial application for SSI, submitted a cover sheet and Childhood Disability Evaluation form dated May 7, 2001, and May 4, 2001, respectively.  (R. at 172-78)  She indicated that Thomas had an impairment, a learning disability, that was severe within the meaning of the regulations but that did not meet, medically equal, or functionally equal a listed impairment.  (R. at 173)  Dr. Frank found that the claimant had a less than marked limitation in the domain of acquiring and using information.  (R. at 175)  She noted that the claimant's level of cognitive ability fell within the borderline range of intellectual functioning and that his full-scale IQ score of 77[1] placed him almost one and a half standard deviations below the mean (id.), and she found "no clinically or statistically significant discrepancy in his verbal and non-verbal ability" (id.).

As for attending and completing tasks, Dr. Frank found that Thomas had a less than marked limitation in this domain as well. (R. at 175)  She stated that Thomas' "ability to concentrate and organize work is an area of variable difficulty" (id.) and noted that, although in 2000 his teacher had estimated his attention span as five to ten minutes, more recently Dr. Rooney had observed that the claimant's activity level was average for his age, he followed instructions, and he appeared to have no difficulty understanding and adapting to new tasks (id.).

---

[1] Dr. Frank relied on the results of the WISC-III administered by Dr. Rooney, which was then the most recent test score in the record.

Susan Diaz Killenberg, M.D., who evaluated the record for DDS on reconsideration of Plaintiff's application for SSI, submitted similar forms on February 1, 2002.  (R. at 179-88)  She, too, found that the claimant's impairment was severe but did not meet or equal the listings.  (R. at 183)  She noted that the WISC-III scores from Dr. Rooney's testing in April of 2001 suggested borderline IQ.  (R. at 187)  Dr. Killenberg concluded that Thomas had a marked limitation in the domain of acquiring and using information.  (Id.)  She recognized that Thomas "is very delayed in academic subjects" (id.) and that he "require[d] [a] special setting to learn" (id.).

Dr. Killenberg found that Thomas had a less than marked limitation in the domain of attending and completing tasks. (Id.)  She observed that the current teacher report stated that within a small structured setting Thomas was neat and organized, worked well alone, and completed work.  (Id.)  However, IEP reports indicated that Thomas was easily distracted, and it was noted that he had low average concentration ability.  (Id.)  Dr. Killenberg stated that "it is clear he needs a structured setting."  (Id.)

Thomas was subsequently referred to the Child Development Center at Rhode Island Hospital[2] for a multidisciplinary team evaluation in order to provide updated information regarding his learning skills and to rule out Attention Deficit/Hyperactivity Disorder ("ADHD").  (R. at 189)  Lucia M. Paolicelli Fratantaro, Ph.D., Psychologist and Patient Coordinator, and James P.

---

[2] The record contains various additional medical reports from Rhode Island Hospital.  (R. at 159-67, 195-213)  The parties agree that these exhibits are not relevant to the instant matter.  See Plaintiff's Memorandum in Support of His Motion for Summary Judgment ("Plaintiff's Mem.") at 6; Defendant's Memorandum of Law in Support of Motion for an Order Affirming the Decision of the Commissioner ("Defendant's Mem.") at 7.

McEneaney, M.Ed., Special Educator, conducted the evaluation and
prepared the Team Evaluation Report, which is dated July 1, 2002.
(R. at 189-94)  The WISC-III was again administered, and Thomas
obtained a Verbal Scale IQ score of 63, within the below average
range, a Performance Scale IQ score of 87, within the lower
limits of the average range, and a Full Scale IQ score of 73,
within the borderline range.  (R. at 190)  Dr. Paolicelli
Fratantaro stated that "[a]ll verbal abilities assessed by the
WISC-III were significantly below average" (id.) and that the
claimant's "receptive language skills were also significantly
below age level expectancies" (id.).  She noted that the
"significant" twenty-four point discrepancy between the
claimant's verbal and performance skills "indicate[d] that the
Full Scale IQ Score of 73 ... should not be taken as the most
accurate estimate of actual cognitive potential." (Id.)  In
contrast, the claimant's Visual-Perceptual and Visual-Motor
skills "showed considerably more variability, with many skills in
the average range.  Thomas did, however, show weaknesses in his
attention to visual detail and in speed and accuracy of ability
to work with rote visual information." (Id.)  Mr. McEneaney
summarized the results of achievement testing as reflecting word
recognition and spelling skills at a mid-first grade level, oral
reading at a primer to mid-first grade level, listening
comprehension at a third grade level, and math computational and
problem solving skills also at a third grade level.  (R. at 192)
Thomas was diagnosed with a language-based learning disability.
(Id.)

     Dr. Paolicelli Fratantaro noted Plaintiff's report that
"Thomas displays a number of attentional problems in that he
often cannot concentrate on school work, can be somewhat
impulsive, and fails to finish projects that he has started" (R.
at 190), but she also observed that his teacher did not indicate

"any clinically significant symptomatology of [ADHD] in the classroom." (R. at 191)  According to the report, "[a]lthough Thomas presents with some inconsistencies in his attention, he is not felt to be presenting with a developmental course and current presentation consistent with an [ADHD]." (R. at 192)

## II.  **Academic**

In addition to Dr. Gelineau's report, the record contains numerous documents from the PSD.  These exhibits include Individualized Educational Plans ("IEP's"), report cards and progress reports, and teacher questionnaires and evaluations. (R. at 96-97, 106-07, 108-48, 150-53, 154-55)

Sheila Meyers, the claimant's second grade teacher, completed a progress report on October 7, 1999, and a school questionnaire on September 12, 2000.  (R. at 96-97, 148)  She had taught Thomas, in a regular class, for the full 1999-2000 school year.  (R. at 96)  He received resource help twice a week.  (R. at 96, 148)  Ms. Meyers noted that Thomas had low reading ability and comprehension, had difficulty staying focused on his classroom work, needed help with most classwork, and was generally well-behaved.  (Id.)  She also stated that his attention span lasted for five to ten minutes.  (R. at 196)  Ms. Meyers indicated that, compared to other students, Thomas was a grade behind.  (R. at 148)  According to Ms. Meyers, his grades ranged from C-'s to D's.  (R. at 97)

A multi-disciplinary team summary dated November 8, 1999, reflects the team's conclusion that Thomas had a learning disability.  (R. at 146)  It was suggested that the claimant's low average scores on the WISC (presumably referring to the November 1998 testing) "may underestimate [his] true potential, given [his] distractability." (R. at 147)  The IEP for the period from November 1999 to November 2000 noted the claimant's average math skills and pre-primer reading and written language

skills, his need to have limits set due to his distractability, and his need for resource help.  (R. at 135-42)  His report card for that year showed grades ranging from B's (in handwriting, science, and physical education) to D's (in word recognition, reading comprehension, written language expression, and spelling).  (R. at 130)  Thomas was referred to special education.  (Id.)

Melissa Cote submitted a teacher evaluation dated November 21, 2001.  (R. at 106-107)  She stated that she had known Thomas for one year and three months and that he was presently in a special education class.  (R. at 106)  According to Ms. Cote, Thomas was mature, was eager to do well, and was one of the highest functioning children in the class; he was very independent, worked well alone, and was able to complete tasks; he worked well with distractions and managed to concentrate; and he was usually, although not recently, well behaved.  (R. at 106) She also indicated that math was a strength, but reading was a weakness.  (Id.)

The IEP's for the periods from January 1, 2001-January 1, 2002, and January 1, 2002-January 1, 2003, again noted that Thomas was easily distracted, required structure, and needed to improve his decoding, comprehension, written language, and spelling skills.  (R. at 109, 120)  The former IEP indicated that Thomas was then reading at a first grade level, and the stated goal was that he improve to a late first grade level.  (R. at 122)  According to the latter IEP, Thomas had improved his reading to a late first grade level.  (R. at 111)  Similarly, the 2001-2002 IEP listed the claimant's math ability at a second grade level, with a stated goal of improving to a third grade level (R. at 124), and the 2002-2003 IEP reflected that he had done so (R. at 113).  Test scores on the Stanford Achievement Test Series administered in March of 2002 demonstrated that the

claimant's abilities were below average in reading comprehension and a mix of below average and average in mathematics problem solving and procedures.  (R. at 150)  Overall, the claimant's performance standard was listed as Level One, indicating "little or no mastery of fundamental knowledge and skills."  (R. at 151) Thomas' report card for the first half of the 2002-2003 school year showed grades ranging from B's to C's, with an A for the first quarter in health.  (R. at 154)

Ms. Tassone, the claimant's sixth grade teacher for English and social studies, completed a Functional Assessment on February 3, 2003.  (R. at 154, 214-17)  She opined that Thomas was extremely limited in the domain of acquiring and using information.  (R. at 215)  According to Ms. Tassone, "Thomas is a 6th grade student whose reading [and] writing abilities are about a grade 1 to ... beginning grade 2 level.  This is 4-5 years below standard ...."  (Id.)  She indicated that his ability to read, write, do math, and discuss history and science was not age appropriate.  (R. at 214)

In the domain of attending and completing tasks, Ms. Tassone also viewed Thomas as extremely limited.  (R. at 215)  She noted that he was unable to focus his attention in a variety of situations in order to follow directions.  (Id.)  Asked whether Thomas was able to sustain his focus in order to complete classroom and homework assignments, she responded "no, not without help."  (Id.)  Regarding his ability to complete a transition task without reminders, Ms. Tassone stated that, although she did not know how he functioned at home, "he does not function well without extra reminders at school."  (Id.)

### Administrative Hearing

At the February 5, 2003, hearing, Plaintiff and Thomas, represented by counsel, appeared.  (R. at 27)  Counsel made a brief opening statement (R. at 30-32), after which Thomas and

Plaintiff testified (R. at 33-40, 41-44).

Counsel observed that, since repeating the first grade, Thomas had been "socially promoted" (R. at 30) based on his age, not his abilities (id.).  She noted that the PSD records contain repeated references to the claimant being easily distracted and frustrated, having difficulty staying focused, and needing a very small structured environment.  (Id.)  She described the various test results in the record and suggested that the WISC-III scores from the Child Development Center seem more consistent with his first grade performance.  (R. at 31)  After summarizing Ms. Tassone's assessment (id.), counsel concluded by stating that "if the claimant's IQ scores which we feel falls [sic] within the listing level of severity, is somehow found not to be ... representative of his functioning, he certainly would meet a functional assessment ... I think he exceeds the definition in the Regulations" (R. at 32).

Thomas then testified.  He was able to identify his school and grade, but could not remember the name of his homeroom teacher.  (R. at 33-34)  According to Thomas, his favorite subject was math and his worst subject was reading.  (R. at 35)  He testified that he played sports and liked to draw.  (R. at 35-37)  Thomas related that he was bored in class.  (R. at 38)  Thomas stated that he had not been suspended for misconduct during the current school year, but had received one detention for not doing his work and leaving the classroom.  (R. at 34, 38-39)  When asked why he did not do his work, he replied that he did not know how to do it.  (R. at 39)  He agreed that he found the work difficult and that he became upset and frustrated when he could not do it.  (Id.)  Thomas also said that he sometimes had trouble concentrating and stopped paying attention when he saw things going on in the hallway.  (R. at 40)

Plaintiff testified that Thomas had difficulty reading and

11

could not spell at all.  (R. at 41-42)  Instead of concentrating
when trying to do his homework, Plaintiff stated that Thomas was
"busy looking around."  (R. at 42)  She described him as very
immature, getting along better with younger children, and not
taking things seriously.  (R. at 41-42)  She also noted that he
had been suspended once, the previous school year, for bringing a
knife to school to try to sell it.  (R. at 42-43)

### Standard of Review

The court's function in reviewing the Commissioner's
decision is a narrow one.  See Geoffroy v. Sec'y of Health &
Human Servs., 663 F.2d 315, 319 (1st Cir. 1981).  The court does
not reconsider facts or re-weigh the evidence.  See Schoenfeld v.
Apfel, 237 F.3d 788, 792 (7th Cir. 2001).  "[T]he resolution of
conflicts in the evidence and the determination of the ultimate
question of disability is for [the Commissioner], not for the
doctors or for the courts."  Rodriguez v. Sec'y of Health & Human
Servs., 647 F.2d 218, 222 (1st Cir. 1981); see also Lopez v.
Chater, 8 F.Supp.2d 152, 154 (D.P.R. 1998)("In reviewing the
record, the district court must avoid reinterpreting the evidence
or otherwise substituting its own judgment for that of the
[Commissioner].").  The decision "will be overturned only if it
is not supported by substantial evidence,[3] or if it is based on
legal error."  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir.
1995); see also Evangelista v. Sec'y of Health & Human Servs.,
826 F.2d 136, 144 (1st Cir. 1987).  If supported by substantial
evidence in the record, the Commissioner's decision must be

---

[3] The Supreme Court has defined substantial evidence as "more
than a mere scintilla.  It means such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28
L.Ed.2d 842 (1971)(quoting Consolidated Edison Co. v. NLRB, 305 U.S.
197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); see also Suranie v.
Sullivan, 787 F.Supp. 287, 289 (D.R.I. 1992)(same).

upheld even if the record could arguably support a different
conclusion.  <u>See</u> 42 U.S.C.A. § 405(g)(2003); <u>Rodriquez Pagan v.</u>
<u>Sec'y of Health & Human Servs.</u>, 819 F.2d 1, 3 (1st Cir. 1987)("We
must affirm the Secretary's resolution, even if the record
arguably could justify a different conclusion, so long as it is
supported by substantial evidence."); <u>Lizotte v. Sec'y of Health</u>
<u>& Human Servs.</u>, 654 F.2d 127, 131 (1st Cir. 1981) ("Although we
as the trier of fact might have reached an opposite conclusion,
we cannot say that a reasonable mind could not have decided as
did the Secretary ...."). The reviewing court is empowered to
scrutinize the record as a whole.  <u>See</u> <u>Mooney v. Shalala</u>, 889
F.Supp. 27, 30 (D.N.H. 1994).

### Error Claimed

Plaintiff alleges that the ALJ's decision that Thomas is not
disabled is not supported by substantial evidence in the record.
<u>See</u> Plaintiff's Memorandum in Support of His Motion for Summary
Judgment ("Plaintiff's Mem.") at 12.

### Discussion

## I.  Children's Disability Benefits

The statutory standard governing SSI disability benefits for
children changed as a result of the August 22, 1996, enactment of
the Personal Responsibility and Work Opportunity Reconciliation
Act of 1996 ("PRWORA"), Pub. L. 104-193, 110 Stat. 2105
(1996).  <u>See</u> <u>Hickman v. Apfel</u>, 187 F.3d 683, 685 n.2 (7th Cir.
1999); <u>Rucker v. Apfel</u>, 141 F.3d 1256, 1259 (8th Cir. 1998);
<u>Jamerson v. Chater</u>, 112 F.3d 1064, 1065 (9th Cir. 1997).  Under
PRWORA, Congress amended 42 U.S.C. § 1382c(a)(3)(C)(i) to
provide:

> Any individual under the age of 18 shall be considered
> disabled for the purposes of this subchapter if that
> individual has a medically determinable physical or
> mental impairment, which results in marked and severe
> functional limitations, and which can be expected to
> result in death or which has lasted or can be expected

13

to last for a continuous period of not less than 12 months.

42 U.S.C.A. § 1382c(a)(3)(C)(i)(2003); see also 20 C.F.R. § 416.906 (2004) (basic definition of disability for children). Even if this requirement is met, a child cannot be considered disabled if he or she is engaged in substantial gainful activity. See 42 U.S.C. § 1382c(a)(3)(C)(ii).

To determine whether a child is disabled, an ALJ must follow a three-step evaluation process. The ALJ must evaluate whether the individual: 1) is performing substantial gainful activity; 2) has an impairment or combination of impairments that is severe; and 3) has an impairment(s) that meets, medically equals, or functionally equals in severity an impairment in the listings. See 20 C.F.R. § 416.924(a)(2004).

The first step, whether the individual is performing substantial gainful activity, is governed by 20 C.F.R. §§ 416.971-416.976.  See 20 C.F.R. § 416.924(b).  If a claimant is working and the work is considered substantial gainful activity, the claimant is considered not disabled.  See id.

At the second step, a claimant must have a medically determinable impairment that is severe.  See 20 C.F.R. § 416.924(c).  An individual does not have a severe impairment if he has no medically determinable impairment or has a "slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations ...." Id.

The third step of the three-step process is more complex. PRWORA created a new standard which replaces the former "comparable severity" standard with one requiring "marked and severe functional limitations." Rucker, 141 F.3d at 1259. Compared to the earlier standard, the new "marked and severe"

14

standard is more stringent.[4] <u>Rucker</u>, 141 F.3d at 1259; <u>Camacho</u>
<u>v. Apfel</u>, No. 97-11933-GAO, 1999 WL 191694, at *1 (D. Mass. Mar.
30, 1999).  The new standard also provides three possible ways to
meet this third step: an individual's impairment or impairments
must meet, medically equal, or functionally equal in severity a
listed impairment.[5] <u>See</u> 20 C.F.R. § 416.924(d)(2004).

   Section 416.925 describes the process of evaluating whether
an impairment meets a listing.  <u>See</u> 20 C.F.R. § 416.925 (2004);
<u>see also</u> 20 C.F.R. part 404, subpt. P, App. 1.  Part B of 20
C.F.R. part 404, subpt. P, App. 1 deals with evaluation of
impairments of children.  <u>See</u> 20 C.F.R. § 416.925(b)(2).

   Medical equivalence with a listed impairment is governed by
20 C.F.R. § 416.926.  Medical equivalence requires that the
medical findings be "at least equal in severity and duration to
the listed findings."  20 C.F.R. § 416.926(a)(2004).

   Functional equivalence with an impairment in the listings
requires that the impairment(s) result in "marked"[6] limitations

---

   [4] The Social Security Administration promulgated new regulations
in 1997 to conform to the new congressional standard.  <u>See</u> <u>Hickman v.</u>
<u>Apfel</u>, 187 F.3d 683, 685 n.2 (7th Cir. 1999).

   [5] At the February 5, 2003, hearing, counsel appeared to argue
that the claimant's IQ scores met a listing.  (R. at 32)  Plaintiff
does not so argue in her memorandum, however, and the court views this
argument as waived, <u>see</u> <u>Borden v. Sec'y of Health & Human Servs.</u>, 836
F.2d 4, 6 (1st Cir. 1987)(holding that argument which "could have been,
but inexplicably was not, presented" to the magistrate had been
waived); <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 273
(1st Cir. 1988)(quoting <u>Borden</u>).  Plaintiff does not contend that the
claimant's impairment medically equals a listing.

   [6] According to § 416.926a:

   (i) We will find that you have a "marked" limitation in a
   domain when your impairment(s) interferes seriously with your
   ability to independently initiate, sustain, or complete
   activities.  Your day-to-day functioning may be seriously
   limited when your impairment(s) limits only one activity or
   when the interactive and cumulative effects of your
   impairment(s) limit several activities.  "Marked" limitation

in two domains of functioning or an "extreme"[7] limitation in one domain.  <u>See</u> 20 C.F.R. § 416.926a(a) (2004).  The domains, or broad areas of functioning, are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being.  <u>See</u> 20 C.F.R. § 416.926a(b)(1)(i)-(vi).[8]

---

also means a limitation that is "more than moderate" but "less than extreme."  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2) (2004).

[7] Regarding an "extreme" limitation, the regulation states:

(i) We will find that you have an "extreme" limitation in a domain when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities.  Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities.  "Extreme" limitation also means a limitation that is "more than marked."  "Extreme" limitation is the rating we give to the worst limitations.  However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function.  It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

[8] The following information is considered in evaluating a claimant's ability to function in each domain: (1) what activities the claimant is able to perform; (2) what activities the claimant is unable to perform; (3) which activities are limited or restricted compared to other children of the same age who do not have impairments; (4) where difficulty with activities arises—at home, in childcare, at school, or in the community; (5) whether the claimant has difficulty independently initiating, sustaining, or completing activities; and (6) what kind of help is needed to perform activities, how much help is needed, and how often help is needed.  <u>See</u> 20 C.F.R. § 416.926a(b)(2)(i)-(vi).

16

## II.  The ALJ's Findings

The ALJ found that Plaintiff was an eleven-year old child who had not engaged in substantial gainful activity since his alleged onset date.  (R. at 15, 19)  The ALJ determined that the medical evidence documented a diagnosis of borderline intelligence with a Full Scale IQ score of 73, an impairment which was severe within the meaning of the regulations.  (Id.) However, the ALJ further determined that the child's impairment did not meet or medically equal the severity of any impairment listed in Part B of Appendix 1 to Subpart P, 20 C.F.R. Part 404. (R. at 15, 20)

The ALJ next addressed functional equivalence.  (R. at 16-19)  The ALJ found that Thomas had a marked limitation in the domain of acquiring and using information, less than marked limitations in the domains of attending and completing tasks and interacting and relating with others, and no limitations in the domains of moving about and manipulating objects, caring for himself, and health and physical well-being.  (R. at 19)  Because Thomas did not have a condition which "result[ed] in extreme limitation in one area of functioning or marked limitation in two areas of functioning ..." (R. at 18), the ALJ determined that the claimant's impairment did not functionally equal a listed impairment (R. at 19, 20).  Accordingly, the ALJ concluded that Thomas was not disabled within the meaning of the Act.  (R. at 14, 20)

## III. Plaintiff's Challenges to the ALJ's Findings

Plaintiff asserts that the ALJ's decision is not supported by substantial evidence in the record because it contains errors of law, fails to give a sufficient basis for his conclusions, and only minimally discusses the relevant evidence of record.  See Plaintiff's Mem. at 12.  Specifically, Plaintiff challenges the ALJ's findings regarding functional equivalence in the domains of

acquiring and using information and attending and completing tasks.[9]  See id.

## IV.  Analysis

In reaching his conclusion that Thomas did not have a condition which resulted in extreme limitation in one area of functioning or marked limitation in two areas of functioning (R. at 18), the ALJ rejected the opinion of Simmone Tassone, one of the claimant's teachers, that Thomas was extremely limited in the domains of acquiring and using information and attending and completing tasks (R. at 19).  The ALJ stated that Ms. Tassone had only known the claimant for five months and accorded her opinion little weight "in light of the reports of the treating and examining practicioners" (id.), including those of Dr. Rooney and the Child Development Center at Rhode Island Hospital (id.).[10]  Plaintiff challenges the ALJ's rejection of Ms. Tassone's assessment, see Plaintiff's Mem. at 12-13, and contends that the claimant's "condition is functionally equivalent to the listed impairments, insofar as he suffers from a 'marked' to 'extreme' limitation in the domain[] of acquiring and using information and a 'marked' limitation in the domain of attending and completing tasks," id. at 12.

### A.  Acquiring and Using Information

In the domain of acquiring and using information, the ALJ determined that Thomas had a marked limitation.  (R. at 19)  The

---

[9] Plaintiff does not dispute the ALJ's findings regarding the remaining domains.  See Plaintiff's Mem. at 13.

[10] The ALJ stated that, "[b]ased on the totality of the record, including Dr. Rooney's opinions at Exhibit 3F as well as the opinions included in Exhibit 6F, the undersigned has determined that the claimant has a marked limitation in acquiring and using information ...."  (R. at 19).  Exhibit 6F (R. at 189-213) consists of various records from Rhode Island Hospital, including the report of the multidisciplinary team evaluation done at the Child Development Center (R. at 189-194).

ALJ stated that:

> There is no doubt that claimant experiences limitation
> due to his intellectual functioning.  However, it is
> equally apparent that claimant does not experience a
> substantial degree of difficulty attributable to his
> overall condition.  The fact that the claimant received
> B's and C's on his report card, as well as having no
> difficulty in understanding and adapting easily to new
> tasks, is indicative that the claimant does not have a
> condition approaching the severity level needed to
> constitute a substantial loss or deficit in the ability
> to function normally.

(R. at 19)

Plaintiff argues that the ALJ's finding of a marked
limitation conflicts with the opinion of the claimant's English
and social studies teacher,  Ms. Tassone, that Thomas was
extremely limited in this domain:

> In rejecting this opinion, the ALJ states that Ms.
> [Tassone] only knew the [claimant] for five months and
> therefore he was giving more weight to the opinions of
> the "treating and examining physicians."  Apparently, he
> was considering the opinion of consultative evaluator,
> Dr. Alan Rooney.  Obviously, the ALJ's method of weighing
> the evidence makes little to no sense.  The ALJ rejected
> the opinion of Thomas['] teacher who consistently works
> with the child five days per week for five to six hours
> per day.[11]  In contrast, he gives more probative weight
> to the opinion of a one-time consultative examiner who
> presumably spent only one to two hours with the child.
> Moreover, Dr. Rooney clearly noted that Thomas's ability
> to acquire and utilize information was "well below
> average" without quantifying the degree of limitation.
> Accordingly, the ALJ's rejection of Thomas' teacher is
> without support of any objective evidence of record.

Plaintiff's Mem. at 12-13 (footnote and citation omitted).

---

[11] Plaintiff's contention that Ms. Tassone worked with Thomas five
to six hours per day appears to be based on the assumption that Ms.
Tassone was his only sixth grade teacher.  In fact, Thomas had six
teachers for seven subjects: math, English, science, social studies,
reading, physical education/health, and music.  (R. at 154)

As an initial matter, the court notes that the ALJ gave specific reasons for his rejection of Ms. Tassone's assessment. (R. at 19)   In addition to noting that Ms. Tassone had only known Thomas for five months, the ALJ found her opinion to conflict with other evidence in the record.  (R. at 19)   The ALJ also observed that the claimant's grades on his most recent report card were B's and C's.  (R. at 19; see also R. at 154)

Dr. Rooney found that the claimant's overall level of intellectual ability was within the borderline range.  (R. at 169-70)  Dr. Rooney also observed that the slight disparity between the claimant's verbal and nonverbal, or performance, abilities was not significant.[12]  (R. at 170)   Dr. Rooney stated that "[i]n general, Thomas' ability to acquire and utilize information is well below average.  Extra effort will be required on his part in acquiring and using information and he will certainly benefit from educational interventions aimed at meeting him at his level of ability."  (R. at 170)   Although Dr. Rooney did not rate Thomas' ability to function in this domain in terms of extreme, marked, or less than marked limitations[13] (R. at 170), his assessment appears consistent with the ALJ's finding of a marked, as opposed to extreme, limitation in this area, compare

---

[12] As noted above, Dr. Rooney administered the WISC-III.  (R. at 168, 169)  Thomas obtained a Verbal Scale IQ of 81, a Performance Scale IQ of 77, and a Full Scale IQ of 77.  (R. at 169)

[13] The DDS evaluators, Drs. Frank and Killenberg, "highly qualified physicians and psychologists who are also experts in Social Security disability evaluation," 20 C.F.R. § 416.927(f)(2)(i) (2004), and who reviewed Dr. Rooney's report along with the other evidence in the record, did utilize the extreme, marked, and less than marked rankings (R. at 175-76, 185, 187).  Dr. Frank found either no limitation or less than marked limitation in all domains evaluated. (R. at 175-76)  Dr. Killenberg found marked limitation in the domain of acquiring and using information, less than marked limitation in the domains of attending and completing tasks and of interacting and relating to others (R. at 187) and no limitation in the remaining domains (R. at 185).

20 C.F.R. § 416.926a(e)(2)(i) (describing "marked" limitation as occurring "when your impairment(s) interferes seriously when your ability to initiate, sustain, or complete activities"), with 20 C.F.R. § 416.926a(e)(3)(i) (noting that "extreme" limitation is found "when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities" and that "extreme" "is the rating we give to the worst limitations").

According to the Team Evaluation Report from the Child Development Center, Thomas was diagnosed with a language-based learning disability. (R. at 192) Testing[14] revealed "a significant discrepancy between below average verbal abilities and visual-perceptual abilities within the lower limits of the average range." (R. at 190) Because of the twenty-four point discrepancy between the claimant's Verbal IQ and Performance IQ, it was suggested that "the Full Scale IQ Score of 73, within the borderline range[,] should not be taken as the most accurate estimate of actual cognitive potential." (Id.) Mr. McEneaney summarized the results of achievement testing as reflecting word recognition and spelling skills at a mid-first grade level, with significantly delayed standard scores which were more than two standard deviations below the mean; word recognition skills also at a mid-first grade level; oral reading at a primer to mid-first grade level; listening comprehension at a third grade level; and math computational skills and problem solving also at a third grade level. (R. at 191-92) The evaluators recommended that Thomas remain in his current self-contained placement given his "significant learning difficulties" (R. at 193) and that non-

---

[14] As previously discussed, the WISC-III was again administered. (R. at 190-91) Thomas obtained a Verbal Scale IQ of 63, a Performance Scale IQ of 87, and a Full-Scale IQ of 73. (Id.) These test scores represent the most recent scores in the record and were utilized by the ALJ in reaching his decision. (R. at 15)

academic subjects and, eventually, vocational training, be considered (id.).

The assessment from the Child Development Center does not undermine the ALJ's finding of a marked limitation in the domain of acquiring and using information. According to § 416.926a, an "extreme" limitation in a domain is found "when you have a valid score that is **three standard deviations or more below the mean** on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(3)(iii) (emphasis added). The regulation provides that "we will find that you have a 'marked' limitation when you have a valid score that is **two standard deviations or more below the mean, but less than three standard deviations,** on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score." 20 C.F.R. § 416.926a(e)(2)(iii) (emphasis added). The only reference to standard deviations in the Team Evaluation Report is to "significantly delayed standard scores which were more than two standard deviations below the mean ...." (R. at 191) This is consistent with the ALJ's finding of a marked limitation.

The findings of the DDS reviewers lend further support to the ALJ's determination of marked limitation in the domain of acquiring and using information. Dr. Frank found Thomas to have a less than marked limitation in this area. (R. at 175) She stated that "Thomas' level of cognitive ability falls in the Borderline range of intellectual functioning" (R. at 175) and noted that, according to Dr. Rooney's testing, the claimant's Full Scale IQ score of 77 "places him almost 1.5 [standard deviations] below the mean" (id.). Dr. Killenberg indicated that Thomas had a marked limitation in this domain. (R. at 187) She

22

noted that Dr. Rooney's IQ testing suggested borderline IQ, that
Thomas was very delayed in academic subjects, and that he
required a special setting in order to learn.  (Id.)  The ALJ
recognized his obligation to consider the reports of the state
agency medical consultants.  (R. at 16)("[T]he undersigned must
also consider the reports of the state agency medical consultants
as well as other treating, examining and non-examining medical
sources following the guidelines in 20 CFR § 416.927 and Social
Security Rulings 96-5 and 96-6p."); see also 20 C.F.R. §
416.927(f)(2)(i) (2004)("State agency medical and psychological
consultants and other program physicians and psychologists are
highly qualified physicians and psychologists who are also
experts in Social Security disability evaluation.  Therefore,
administrative law judges must consider findings of State agency
medical and psychological consultants or other program physicians
or psychologists as opinion evidence ...."); SSR 96-6p, available
at 1996 WL 374180, at *1 ("Findings of fact made by State agency
medical and psychological consultants and other program
physicians and psychologists regarding the nature and severity of
an individual's impairment(s) must be treated as expert opinion
of nonexamining sources at the administrative law judge and
Appeals Council levels of administrative review."); SSR 96-5p,
available at 1996 WL 374183, at *6 (noting that at ALJ and
Appeals Council levels opinions of State agency medical and
psychological consultants become opinion evidence and must be
considered).

It is the ALJ's responsibility to resolve conflicts in the
evidence, not the court's.  See Seavey v. Barnhart, 276 F.3d 1,
10 (1st Cir. 2001)("[T]he responsibility for weighing conflicting
evidence, where reasonable minds could differ as to the outcome,
falls on the Commissioner and [her] designee, the ALJ."); see
also Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218,

222 (1st Cir. 1981)("[T]he resolution of conflicts in the
evidence and the determination of the ultimate question of
disability is for [the Commissioner], not for the doctors or for
the courts."). The ALJ in the instant case resolved the
conflicts in the evidence, as he is entitled to do, see Seavey,
276 F.3d at 10, by giving more weight to other evidence in the
record than to the report of one of the claimant's teachers, see
Lizotte v Sec'y of Health & Human Servs., 654 F.2d 127, 129 (1st
Cir. 1981)("[I]t is clear that it is within the [Commissioner's]
province to accord greater weight to the report of a medical
expert commissioned by the [Commissioner].").

     Moreover, although Plaintiff asserts that "the ALJ's method
of weighing the evidence makes little to no sense," Plaintiff's
Mem. at 13, the regulations support the ALJ's decision to accord
little weight to the opinion of Ms. Tassone. The applicable
regulation states that "[w]e need evidence from acceptable
medical sources to establish whether you have a medically
determinable impairment(s)." 20 C.F.R. §416.913(a) (2004).
"Acceptable medical sources" include licensed physicians,
**licensed or certified psychologists,**[15] licensed optometrists,
licensed podiatrists, and qualified speech-language pathologists.
See 20 C.F.R. § 416.913(a)(1)-(5) (emphasis added). By contrast,
the regulation provides that in addition to evidence from
acceptable medical sources, "we may also use evidence from other
sources to show the severity of your impairment(s) ... [and], if

---

[15] Included among licensed or certified psychologists are "school
psychologists, or other licensed or certified individuals with other
titles who perform the same function as a school psychologist in a
school setting, for purposes of establishing mental retardation,
learning disabilities, and borderline intellectual functioning ...."
20 C.F.R. 416.913(a)(2) (2004). Although Ms. Tassone lists her title
as "CRT" (R. at 217), there is no definition of "CRT" in the record,
nor is there any evidence that she "perform[s] the same function as a
school psychologist in a school setting ...," 20 C.F.R. §
416.913(a)(2).

you are a child, how you typically function compared to children your age who do not have impairments." 20 C.F.R. § 416.913(d). "Other sources" include "[e]ducational personnel (for example, **school teachers,** counselors, early intervention team members, developmental center workers, and daycare center workers) ...." 20 C.F.R. § 416.913(d)(2) (emphasis added). Clearly Dr. Rooney, a psychologist, would fall within the category of "acceptable medical sources," while Ms. Tassone, one of the claimant's teachers, would be considered among the "other sources."

The court concludes that the ALJ's finding of a marked limitation in the domain of acquiring and using information is supported by substantial evidence and that the ALJ did not err in declining to credit the opinion of the claimant's teacher, Ms. Tassone. The fact that reasonable minds could reach different conclusions regarding the claimant's degree of limitation in this domain does not justify overturning the ALJ's decision. See Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 131 (1st Cir. 1981)("Although we as the trier of fact might have reached an opposite conclusion, we cannot say that a reasonable mind could not have decided as did the [Commissioner] ...."); see also Rodriguez, 647 F.2d at 222 ("We must uphold the [Commissioner's] findings if a reasonable mind, viewing the evidence in the record as a whole, could accept it as adequate to support the conclusion.").

## B.   Attending and Completing Tasks

The ALJ found that Thomas had a less than marked limitation in the domain of acquiring and using information. (R. at 19) Plaintiff argues that in reaching this conclusion "the ALJ once again ignores the opinion of Thomas' teacher ...," Plaintiff's Mem. at 13, referring to Ms. Tassone, and that the ALJ's "conclusion is inconsistent with the overwhelming objective evidence which repeatedly references Thomas' great difficulty

25

with his ability to attend to his work and stay focused," id.

Although Ms. Tassone opined that Thomas was extremely limited in this domain (R. at 215) and Ms. Meyers estimated that his attention span lasted from five to ten minutes (R. at 96), the medical source opinions are consistent with the ALJ's finding of a less severe limitation.  Dr. Gelineau observed that the claimant's lack of concentration and inability to focus on his work "concerns his teacher the most" (R. at 156), but the Child Behavior Checklist was only "borderline significant" for attention problems (R. at 157).  Dr. Rooney reported that Thomas had no difficulty remaining on task during the evaluation and did not show signs of fidgetiness.  (R. at 170)  Dr. Rooney "expected that he should be able to remain on task in activities of which he is cognitively capable.  Should Thomas be ... engaged in tasks that are beyond his level of ability, it is certainly likely that his attention would wane."  (Id.)  Both Dr. Frank and Dr. Killenberg indicated a less than marked limitation in this domain.  (R. at 175, 187)  The evaluation from the Child Development Center noted both Plaintiff's report of the claimant's "attentional problems" (R. at 190) and a teacher report which "was not indicative of any clinically significant symptomatology of [ADHD] in the classroom" (R. at 191).  The evaluators concluded that "[a]lthough Thomas presents with some inconsistencies in his attention, he is not felt to be presenting with a developmental course and current presentation consistent with [ADHD]."  (R. at 192)  According to the Claimant's Recent Medical Treatment form, Thomas did "not need medication at this point" (R. at 149) for his attention problems.

The court concludes that the ALJ's finding of a less than marked limitation in the domain of attending and completing tasks is supported by substantial evidence in the record.  Although there is evidence in the record indicating otherwise, the ALJ

could reasonably have reached this conclusion.  See Lizotte, 654 F.2d at 131; Rodriguez, 647 F.2d at 222.  Additionally, as noted previously, see Discussion section IV.B. supra at 19-24, ALJ did not err in rejecting Ms. Tassone's assessment.

### C.   Summary

The ALJ's finding that Plaintiff does not have an extreme limitation in one area of functioning or marked limitation in two areas of functioning is supported by substantial evidence and is free from legal error.  Consequently, this court must uphold the ALJ's decision that Plaintiff does not have an impairment that is functionally equivalent to one in the Listing, even if Plaintiff (or the court) might view the record differently.  See Evangelista, 826 F.2d at 144 ("We must affirm the [Commissioner's] [determination], even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence.")(second alteration in original); Rodriguez Pagan, 819 F.2d at 3 (same).

### Conclusion

The Commissioner's decision that Plaintiff failed to establish that the claimant was disabled within the meaning of the Act is supported by substantial evidence in the Record and is legally correct.  Accordingly, the court grants Defendant's Motion to Affirm and denies Plaintiff's Motion to Reverse or Remand.

SO ORDERED.

ENTER:

David L. Martin

DAVID L. MARTIN
United States Magistrate Judge
June 3, 2005

BY ORDER:

Deputy Clerk

27